## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONICA LEE ABATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-288-SPB |
| | ) | |
| WAL-MART STORES EAST, L.P. | ) | |
| d/b/a WAL-MART STORE #2561, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

This civil action arises from an incident in which Plaintiff, Monica Lee Abate, was injured while on the premises of Defendant, Wal-Mart Stores East, L.P., d/b/a Wal-Mart Store #2561 ("Walmart" or "Defendant").  During the course of the litigation, Wal-Mart made a settlement offer and memorialized that offer in a Release Agreement that Plaintiff ostensibly signed.  Plaintiff now contends that she was never permitted to review the agreement, never expressly authorized its terms, and does not intent to abide by the agreement.

Pending before the Court is the Defendant's motion to enforce the Release Agreement. For the reasons that follow, Defendant's motion will be granted.

I.    **Background**

On October 15, 2015, Plaintiff was on the Defendant's premises when she was struck by a falling ladder and sustained injuries.  This litigation ensued.  During the course of the litigation, Plaintiff was represented by Attorney Michael Koehler and Defendant was represented by Attorney Rebecca Izsak.

On October 30, 2019 the parties participated in a settlement conference with the Court. At some point during these proceedings, Ms. Izsak was advised that the case could be settled for

$250,000.  At the time, Ms. Izsak did not possess authority to offer $250,000 on behalf of Walmart.

Proceedings were adjourned and the Court scheduled a subsequent settlement conference for November 12, 2019.  During this conference, Ms. Izsak tendered Walmart's last and final settlement offer in the amount of $250,000.

On November 15, 2019, Mr. Koehler communicated to Ms. Izsak that Plaintiff was willing to resolve the underlying litigation for $250,000.  See ECF No. 47-3.  In an email to Ms. Izsak, Mr. Koehler wrote:

> This email follows a voice mail I left for you on your cell phone today.
>
> Ms. Abbate is willing to sign a Release and resolve this matter for the sum of $250,000.00 as we discussed. Please forward a Release to my attention.
>
> Please cancel the DME with Dr. Petrick scheduled for next week.
>
> If you need to speak with me please call. The sooner this is resolved, the better.

Id.

In reliance upon this communication, Ms. Izsak cancelled an independent medical examination of the Plaintiff that she had previously scheduled in anticipation of trial proceedings.  ECF No. 47-5.  This resulted in Walmart's loss of a nonrefundable $3,000 fee. Id.

Ms. Izsak also transmitted to Mr. Koehler a "Full and Final Confidential Settlement, Release of All Claims and Indemnity Agreement" (the "Release Agreement"), confirming the parties' agreement to settle the case for $250,000.  ECF No. 47-4; ECF No. 51-1.  Plaintiff signed the last page of the agreement on November 23, 2019, and Mr. Koehler then returned the executed Release to Ms. Izsak via correspondence that she received on November 26, 2019. ECF No. 47-6, 47-7, 51-1.

Thereafter, Medicare/CMS acknowledged its notice of the settlement and issued a final payment letter to Attorney Koehler dated December 2, 2019.  ECF No. 47-9.  Mr. Koehler forwarded this correspondence to defense counsel on December 5, 2019 so that Walmart could issue a check to Medicare/CMS in satisfaction of its lien interest in the settlement proceeds.  Id.

Meanwhile, on November 29, 2019, the Court received an *ex parte* letter from Plaintiff, acting on her own behalf, in which she expressed dissatisfaction with her counsel and alleged, in essence, that Mr. Koehler had "bullied" her into signing the Release.  ECF No. 37.  "Most unsettling," Plaintiff wrote, "[was] the day that [Mr. Koehler] forced my signature without providing a settlement agreement[.]"  Id.  Plaintiff alleged that, "[W]hen I asked him for a copy [of the agreement] during a meeting with him [on] Saturday, November 23, 2019[,] he said that he had to fax [the Court] and the attorney for Walmart my signature before I could read it."  Id.

On December 11, 2019, the Court held a conference to address Plaintiff's *ex parte* correspondence.  ECF No. 38.  Those physically present included Plaintiff, Mr. Koehler, Carmela Witkowski (Plaintiff's roommate), and Brenda Abbate (Plaintiff's sister).  Ms. Izsak appeared telephonically.  The Court had a stenographer present and accepted testimony from those present.

Testimony of Attorney Koehler

Mr. Koehler testified that, following the October 30, 2019 settlement conference, he indicated to Ms. Izsak that Walmart "needed to come up with more money than the $150,000 that was offered . . . ."  Tr. Hrg. (12/11/19), ECF No. 46, at 3:6-7.  Accordingly,

> [Ms. Izsak] went back to her people, and there was a discussion of 200,000, and then there was a discussion of 250,000 as being the final offer that they would make to settle this case without going to trial.

And I communicated that offer to my client. We discussed that on a couple occasions, that offer, and what that would entail in terms of what she would put in her pocket after payment of fees, costs, and the CMS Medicare lien.

Ms. Abbate agreed to the settlement offer that was communicated to defense counsel. Defense counsel forwarded me their standard Walmart-type release, with the release language in it. I sat down with Miss Abbate in my office. We discussed the release.

I went through, as I typically do, provisions of the release, because it's typical contractual language, you know, in terms of the Medicare issues that need to be resolved, payment of the lien --

\*\*\*

. . . and we sat down with the release documents in my office. I went and explained to her, with Carmela [Witkowski] present, what the terms and conditions of the release were; that it was confidential, that they weren't accepting liability, that there was a disputed claim, that you can't sue them again. If you sue them again, you'll have to pay attorney's fees and costs. That it's governed by Pennsylvania laws. There's all the typical provisions that are in there.

Id. at 3:9-25; 4:20-5:3. According to Mr. Koehler, "Miss Abbate [said] I just want it -- I'm done, I'm settled [sic], I want to sign it, I want to settle it, so she signed the paperwork." Id. at 5:4-6.

Mr. Koehler claims he explained to Plaintiff that he was going to cut his fees, and the Medicare lien was going to be reduced, which would allow her to collect a net sum in excess of $150,000. ECF No. 46 at 5:13-20. He "discussed . . . the paperwork" with Plaintiff. Id. at 5:22. Then:

the paperwork was submitted to defense counsel. And I have submitted the Medicare reduction lien letter that we received on the final demand to defense counsel.

And we had written a letter to her primary care physician, which was an addendum to the release, to see if she would sign the letter basically saying that with a reasonable degree of medical certainty, I don't believe any of the future medical treatment is related to this original incident, so that there would not have to be a Medicare set-aside; that Medicare's interests would be taken into account and that the case would be resolved with that addendum. And that's typical for them to do that type of thing. We've encountered that in the past.

On Monday, . . . Monica called, emailed me, made some phone calls; wasn't happy with the settlement, . . . told me things like  . . . she didn't read the release, she wants to read the release, she wants to come back in with her sister and come in. And so . . . I said, look, come back in, let's sit down; let's -- you want to go back over everything again, here's the release.

4

ECF No. 46 at 5:23-6:19.  According to Mr. Koehler, Plaintiff indicated she "[didn't] want the release, [didn't] want copies of anything, [didn't] want nothing [sic]."  Id. at 6:19-21.  Mr. Koehler claims he "went through it again with her after that."  Id. at 6:21-22.  He acknowledged that "[i]t's a difficult situation" and Plaintiff has "gone back and forth" about the settlement.  Id. at 6:22, 6:25-7:1.

> So I said, look, you know, this is -- we've discussed this again and again and again, and we've gone through the terms and conditions of the settlement, the amount of the settlement, the issues in the case with regard to -- you know, all the issues in the case that are being present at the time of trial.
>
> And, you know, it was my belief that at this point the case was settled; that . . . she would accept the settlement; you know, come back to, okay, I'm fine with the settlement . . . and get the thing done.

ECF No. 46 at 7:2-12.

Testimony of Carmela Witkowski

Carmela Witkowski is Plaintiff's roommate and has lived with her for approximately 30 years.  ECF No. 46 at 16:4-5.  She acknowledged being present during Plaintiff's meeting with Mr. Koehler on Saturday, November 23, 2019 and witnessed Mr. Koehler explain the settlement offer of $250,000 and how that would be divvied up if Plaintiff agreed to settle.   Id. at 16:6-10.  She testified, however, that Plaintiff signed only "a blank piece of paper.  There was no settlement with it."  Id. at 16:10-11.  Ms. Witkowski stated that, during this meeting, Mr. Koehler talked fast and she (Ms. Witkowski) "didn't know exactly what he was trying to say; whether these medical bills were all included into the settlement or if this is what she was going to get clear."  Id. at 16:13-16.  Mr. Koehler did explain to Plaintiff that, if she did not accept the $250,000 offer, then she'd be going to trial.  Id. at 16:17-18.  Plaintiff indicated "she would think about it," but "she didn't really want to sign anything unless she read the settlement first, which

she didn't do." Id. at 16:19-21.  Mr. Koehler then questioned Ms. Witkowski, and the following

exchange ensued:

> BY MR. KOEHLER:
>
> Q. Do you remember me discussing the different terms and conditions in the release; that there was -- this was a release of the claim for $250,000; that it was going to be confidential --
>
> A. Yes, I remember that.
>
> ***
>
> Q. That we were going to have to pay the Medicare lien amount back to Medicare. Do you recall us discussing that?
>
> A. I didn't know what that meant, no.
>
> Q. Okay. But we did discuss that. We did discuss that she was going to have to pay the Medicare lien that's coming out before she's going to put 152,000 in her pocket, is how I termed it. Do you remember that?
>
> A. Right. Right.
>
> Q. Okay. That they were going to ask us to get a letter from her doctor so that Medicare could continue to pay for her medical treatment. Remember, we talked about Medicare continuing --
>
> A. Right.
>
> Q. -- to pay for her medical treatment?
>
> A. Right.
>
> Q. Okay. And you do recall that Monica said that she did want to get this thing settled that day; that she was agreeable to settle that for that amount of money?
>
> A. Well, she --
>
> Q. She might not have been totally happy with the settlement, but she was agreeable that -- that this was the best that was going to happen, and that she wanted to settle it, and that she actually signed the paperwork at that time. Do you recall that?
>
> A. I know she wanted to read it, but she never did.
>
> Q. Do you remember me talking about it, and she saying to me, well, wait a minute; I just -- I just want to sign it, I know what --
>
> A. Yeah, I remember her talking about it, so --

Q. And her telling me, I just want to sign it, I just want to sign it and get done with this. Do you remember that; her just telling she just wants to be done with this? And we've had this conversation a number of times over this.

 A. I know.

Q. But, obviously, that morning we did. Do you recall that, ma'am?

A. She wanted to settle it.

ECF No. 46 at 19:17-21:15.

Testimony of Plaintiff Monica Abbate

Plaintiff testified that, although she signed a signature page, she did not possess or review the entirety of the Release Agreement.  ECF No. 46 at 25:13-14.  The Court then conducted the following colloquy with Plaintiff:

THE COURT:  . . .  But by signing [the signature page], did you not agree to the - -

MS. ABBATE: No.

THE COURT: -- $250,000?

MS. ABBATE: No, I did not. Because I said to him --

THE COURT: Then why did you sign the paper?

MS. ABBATE: This one? Because he said he had to fax it to you and Attorney Sember so he could --

THE COURT: In order to get the $250,000.

THE WITNESS: Yes. And then we'd go -- we'd go over it. We'd go over it together, along with this (indicating).

THE COURT: So you agreed to the $250,000 by signing --

THE WITNESS: No.

THE COURT: -- this.

MS. ABBATE: No, I did not, Your Honor. I said, I'll think about it. I said this: So it will put $152,000 right in my pocket? That's exactly what I said. He said, yes. I laughed, and I said, I'll think about it. Okay, sign this.

7

> He's -- you know what he said two weeks before? Get to my office; you have to
> sign these papers. I said, what for? He said, I'm sick of you repeating yourself all the time.
> And the Judge said that's as good as it's going to get. I said, I don't believe the Judge said
> that. And that's what he said to me. . . .

ECF No. 46 at 25:16-26:16.

<u>Testimony of Brenda Abbate</u>

Finally, the Court heard testimony from Plaintiff's sister, Brenda Abbate ("Brenda").

ECF No. 46 at 21: 18-21.  Brenda was not present for the November 23, 2019 meeting when

Plaintiff signed her name to the signature page of the Release Agreement, but she did accompany

Plaintiff to Mr. Koehler's office on a number of occasions, including a meeting that occurred the

following Monday, November 25, 2019.  Id. at 22:1-4, 13-17; 23:18-20.  Upon questioning by

Mr. Koehler, Brenda agreed that, over the course their various meetings, Mr. Koehler had

discussed with Plaintiff various medical issues, possible trial issues, and potential settlements in

the case; however, Brenda characterized Mr. Koehler's explanations of these matters as "a bunch

of mumbo-jumbo."  Id. at 22:18-23:6.  She claimed that "every time" Mr. Koehler had discussed

the case, Plaintiff "said she wanted to go to trial."  Id. at 23:13-14.  Brenda testified that, during

the conference on November 25, 2019, "[t]he meeting didn't go very far. Monica was upset about

the supposed agreement and ended up walking out."  Id. at 22:7-8.

## II.    **Additional Procedural History**

In the course of the December 11, 2019 hearing, the undersigned remarked:

> . . . to my mind, a settlement agreement was signed, and the case was settled.
> There's a contract here that you signed.  And then how it appears to me is then you
> had buyer's remorse, which happens all the time, and you think you could do better
> with a different lawyer and proceeding ahead.

ECF No. 47-8 at 23.  Despite these initial tentative remarks, the Court did not make a definitive

ruling at that point concerning the enforceability of the parties' settlement agreement.

Instead, the Court attempted to posture the parties' dispute for resolution on a more developed record. Upon questioning by the undersigned, Plaintiff confirmed that she was firing Mr. Koehler and would oppose the settlement. Defense counsel indicated that Walmart would be filing a motion to enforce the settlement, which it eventually did on February 27, 2020. ECF No. 47. In the meantime, Attorney John Knox entered an appearance on Plaintiff's behalf and continues to represent her in connection with the pending proceedings.

The parties have since fully briefed and argued their positions concerning the enforceability of the settlement agreement. See ECF Nos. 47, 50, 51, 52, 53, 55, 56. During a status conference held on August 21, 2020, the Court afforded the parties an opportunity to submit additional evidence, either through affidavits or a second hearing; however, both sides declined that invitation. Accordingly, the record is now closed and the Defendant's motion is now ripe for resolution. The Court's analysis follows.

### III. __Discussion__

#### A. _Governing Legal Standards_

In Pennsylvania,[1] "[t]he validity and enforceability of settlement agreements is governed by state contract law." *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194,

---

[1] As a federal court sitting in diversity, this court must generally apply the substantive law of the state in which this court sits, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), including its choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941). Here, however, the parties have implicitly agreed that Pennsylvania law governs the contractual issues in this case, as they discuss only Pennsylvania law in their respective briefs. As a result, the Court need not engage in a choice-of-law analysis. *See Schiavone Constr. Co. v. Time, Inc*., 735 F.2d 94, 96 (3d Cir.1984)) (because the parties appear to implicitly agree on the applicable choice of law, this Court will not challenge their decision.); *84 Lumber Co., L.P. v. Bryan Const. Co*., Case No. 2:09–cv–1030, 2011 WL 666209, at *5 (W.D. Pa. Feb.14, 2011) ("In this case, the parties do not dispute that Pennsylvania law applies to this case, and the Court need not engage in a choice of law analysis."); *Tyler v. King*, 496 A.2d 16, 21 (Pa. Super. Ct.1985) ("[P]arties may bind themselves, even by a statement made in court, on matters relating to individual rights and obligations, so long as their stipulations do not affect the court's jurisdiction or due order of business.").

The Court does note that the Release Agreement contains a choice of law provision by which the parties ostensibly agreed that the law of Arkansas would "govern, control and apply to [the] Agreement and all matters or claims arising out of or relating to [the] Agreement." ECF No. 51-1 at 9, ¶19. It appears, however, that the parties have waived this provision of the Agreement, to the extent it applies to the instant dispute. Nothing in the Release

200 (3d Cir. 2012) (nonprecedential). "To be enforceable, a contract must be between parties

who have manifested an intention to be bound by the terms of the agreement; have terms that are

sufficiently definite to be specifically enforced;[1] and be supported by consideration on both

sides of the contract—that is, bargained-for exchange and either a benefit upon the promisor or a

detriment to the promisee.[1]" *Ohama v. Markowitz*, 434 F. Supp. 3d 303, 311–12 (E.D. Pa. 2020)

(internal footnotes omitted), *reconsideration denied*, No. CV 19-2150, 2020 WL 1124402 (E.D.

Pa. Mar. 6, 2020) (citing *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F.2d

291, 298-99 (3d Cir. 1986)).  While a signed writing is some evidence of intent, it is not

required, nor is it dispositive.  *See Shell's Disposal*, 504 F. App'x at 201 (citing authority);

*Ohama v. Markowitz*, 434 F. Supp. 3d 303, 312.

Settlement agreements are generally favored in Pennsylvania because they reduce the

burden on the courts and expedite the transfer of money into the hands of a complainant. *Trent*

*Motel Assocs., L.P. v. Stadium Hotel Rest. Grp., Inc*., No. 1164 EDA 2012, 2013 WL 11256575,

at \*5 (Pa. Super. Ct. Aug. 20, 2013) (citing *Mastroni–Mucker v. Allstate Ins. Co*., 976 A.2d 510,

518 (Pa. Super. Ct. 2009)).  Consequently, courts in this Commonwealth enforce settlement

agreements "so long as the contracting parties agree upon all the material items and there is no

---

Agreement itself or Pennsylvania law seemingly precludes such a waiver.  *See, e.g., Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) ("Our review of the law in this area convinces us that parties may waive choice-of-law issues."); *Domino's Pizza LLC v. Deak, 383 F. App'x* 155, 157 n. 2 (3d Cir. 2010) (noting that a contractual choice-of-law provision is not a jurisdictional issue and the parties may waive their right to enforce it).

Regardless, to the extent a choice-of-law analysis is required, the Court finds no reason to apply different law to the facts of this case. As a general matter, "Pennsylvania courts give effect to choice of law provisions when the state selected enjoys a substantial relationship to the parties or the transaction and the application of the law is not contrary to the public policy of another state with a stronger interest in the transaction." *Verizon Commc'ns Inc. v. Pizzirani*, 462 F. Supp. 2d 648, 655 (E.D. Pa. 2006) (citing *Kruzits v. Okuma Mach. Tool, Inc*., 40 F.3d 52, 55 (3d Cir.1994)) (footnote omitted). In this case, Pennsylvania has a substantial connection to the parties and the issues at hand because Plaintiff was injured at the Defendant's Pennsylvania store, both parties' counsel practice in this Commonwealth, and the negotiations that gave rise to the disputed settlement agreement occurred here.  In addition, neither side has alleged that the application of Pennsylvania law would contravene the public policy of another state with stronger ties. Accordingly, all issues regarding the enforceability of the Release Agreement will be analyzed under Pennsylvania law.

clear showing of fraud, duress, or mutual mistake . . . ."  Id.  (citing *Felix v. Giuseppe Kitchens &*
*Baths, Inc.*, 848 A.2d 943, 947 (Pa. Super. Ct. 2004)); *see also Pennsbury Vill. Assocs., LLC v.*
*Aaron McIntyre,* 11 A.3d 906, 914 (Pa. 2011) ("A settlement agreement will not be set aside
absent a clear showing of fraud, duress, or mutual mistake.") (citing *Rago v. Nace*, 460 A.2d
337, 339 (Pa. Super. Ct. 1983)).

At the same time, Pennsylvania law recognizes that parties settling legal disputes forfeit
substantial legal rights, and such rights should only be forfeited knowingly.  *Reutzel v. Douglas,*
*M.D.*, 870 A.2d 787, 790 (Pa. 2005) (internal citation omitted); *see also Salsman v. Brown*, 51
A.3d 892, 894 (Pa. Super. Ct. 2012).  Accordingly, a client's attorney may not settle a case under
Pennsylvania law without the client's grant of express authority.  *Reutzel,* 870 A.2d at 789-90,
792; Salsman, 51 A.3d at 894; *Brannam v. Reedy*, 906 A.2d 635, 640 (Pa. Commw. Ct. 2006).

B.   *Questions as to Express Authority, Fraud, Mistake or Duress*

In this case, an initial disputed factual question exists as to whether Mr. Koehler had
express authority to enter into the settlement agreement on Plaintiff's behalf and whether his
actions otherwise rendered the agreement unenforceable.   Mr. Koehler testified that Plaintiff
expressly agreed to the settlement as evidenced by her signature on the Release Agreement.
Plaintiff counters that she was "bullied" into signing the signature page and was not permitted to
see the full agreement beforehand.

Based upon the testimony received during the December 11, 2019 hearing, the Court
finds by a preponderance of evidence that Mr. Koehler had express authority to accept
Walmart's $250,000 settlement proposal on behalf of Plaintiff.  To that end, the Court credits

11

Mr. Koehler's representation, as an officer of the Court,[2] that Plaintiff verbally accepted Walmart's $250,000 settlement offer following the November 12, 2019 conference in this case, as reflected in Mr. Koehler's November 15, 2019 email to defense counsel. The Court further credits Mr. Koehler's testimony that, during his meeting with Plaintiff on November 23, 2019, he explained the provisions in the proposed Release Agreement to her, including the fact that Walmart would pay $250,000 in exchange for the release of her claims, and Plaintiff would collect a net amount of $152,000 once Mr. Koehler's reduced fee was paid and Medicare's reduced lien was satisfied. The Court further credits Mr. Koehler's testimony that Plaintiff indicated during that November 23 meeting that she just wanted to sign the settlement papers and be "done" with the litigation. The Court finds that this aspect of Mr. Koehler's testimony was credibly corroborated by the testimony of Plaintiff's roommate Carmela Witkowski. Under these circumstances, Mr. Koehler possessed express authority -- as evidenced by Plaintiff's signature on the last page of the Release Agreement -- to accept Walmart's settlement offer and the related terms of the Release Agreement.

Next, the Court finds that the terms of the parties' settlement were sufficiently definite to permit specific enforcement. The terms of the settlement are spelled out in detail in the Release Agreement that Walmart provided and Plaintiff signed.

Third, the Court finds that the agreement is supported by adequate consideration. Walmart gave consideration by promising to pay a sum total of $250,000, while Plaintiff gave consideration in the form of the various promises set forth in the Release Agreement -- including, most significantly, the release of any and all potential legal claims arising from the October 15, 2015 incident.

---

[2] The Court notes that Mr. Koehler, as an officer of the Court, has a duty of candor to this tribunal under Pennsylvania Rule of Professional Conduct 3.3.

Fourth, the Court concludes that there has been no clear showing of fraud, duress, or mistake in connection with Plaintiff's execution of the Release Agreement, as would justify setting it aside.  In her brief in opposition to Defendant's motion, Plaintiff states that, "without further information, [she] is not alleging that Walmart engaged in duress or fraud in merely communicating its settlement offer and transmitting the Release to Attorney Koehler.  Moreover, the Plaintiff, without further information, is not alleging that there is any mutual mistake between Walmart and Plaintiff."  ECF No. 52 at 13.

Instead, Plaintiff appears to be alleging wrongdoing only on the part of Mr. Koehler. She implies that Mr. Koehler engaged in fraud by refusing to provide the agreement to her in advance of her signing it, instead misinforming her that she had to fax her signature to Walmart's counsel before she could read it.  Plaintiff further claims she did not know that she was actually signing the signature page of the Release Agreement.  But to the extent Plaintiff is alleging that Mr. Koehler fraudulently induced her to sign the Release Agreement, her remedy is to file a civil action against Mr. Koehler for damages; the alleged fraud by her own attorney does not provide grounds to invalidate the settlement in this case.  *See Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346, 1351 (Pa. 1991) ("[A lawyer's] fraudulent inducement . . . does not alter the settlement agreement between plaintiff and defendant, since it is not the opposition who has committed the fraud, but the plaintiff's own lawyer.  As such, the settlement agreement must be honored.  So that the plaintiff who has been defrauded may have redress, however, we would permit him to proceed under a theory of fraud against the attorney who represented him in the original action."); *see also Townsend v. Spear, Greenfield & Richman, P.C.,* No. 2950 EDA 2019, 2020 WL 4696698, at *8 (Pa. Super. Ct. Aug. 13, 2020) (quoting *Muhammad,* 587 A.2d at 1351).

13

To the extent that Plaintiff alleges she signed the signature page of the Release Agreement under duress from Mr. Koehler, this line of argument is also unavailing.  First, it is not clear to this Court that a settlement agreement can be set aside under Pennsylvania law in cases where the alleged duress is said to have emanated from the contracting party's own counsel.  *See, e.g., Degenhardt v. Dillon Co*., 153, 669 A.2d 946, 950 (Pa. 1996) (recognizing that "[m]utual assent to a contract does not exist . . . when *one of the contracting parties* elicits the assent *of the other contracting party* by means of duress."); *McDonald v. Whitewater Challengers, Inc*., 116 A.3d 99, 117 (Pa. Super. Ct. 2015) (noting that the foregoing doctrine has been "traditionally invoked between contracting parties" and declining to extend the doctrine to include non-contracting third parties); *see also Ballard ex rel. Ballard v. Philadelphia Sch. Dist*., 273 F. App'x 184, 187 and n.2 (3d Cir. 2008) (affirming district court's finding that settling party had failed to make a showing of duress; claims that she had felt pressure from her counsel or felt that she was under time constraints did not amount to duress as a matter of law and would not affect the validity of the settlement agreement); *accord Associated Estates LLC v. BankAtlantic*, 164 A.3d 932, 941–43 (D.C. 2017) (court noting "there appears to be an absence of law, in this jurisdiction and elsewhere, to the effect that a party may rescind a settlement agreement on the basis of undue influence by the party's own attorney) (citing authority).  Limiting the availability of rescission to only those situations where the duress emanated from the other contracting party would seem to be consistent with the Pennsylvania's Supreme Court's ruling in *Muhammed,* 587 A.2d at 1351, discussed above.

On the other hand, at least one federal court in this jurisdiction has followed the rule set forth in Section 175 of the Restatement (Second) of Contracts.  That rule provides, in relevant part, that: "If a party's manifestation of assent is induced by one who is not a party to the

transaction, the contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the duress either gives value or relies materially on the transaction." *Meadows v. Harcum Coll.*, No. CIV.A. 13-2946, 2014 WL 5591035, at *2 (E.D. Pa. Nov. 4, 2014) (discussing Restatement (Second) of Contracts §175 (1981)).  To the extent this rule has applicability in this jurisdiction, the Court notes that there is no evidence that would establish Walmart's notice of the actions Mr. Koehler allegedly took to place Plaintiff under "duress."  Moreover, the evidence shows that, in reliance on Plaintiff's apparent assent to the settlement terms, and upon the request of Mr. Koehler, defense counsel cancelled an independent medical examination that had previously been scheduled, resulting in a $3,000 loss to the Defendant.  Accordingly, under the rule set forth in Section 175 of the Restatement, there are no grounds for setting aside the parties' settlement agreement, notwithstanding Plaintiff's allegations of duress.

In any event, to the extent the Court needs to make a factual determination in this regard, the undersigned finds that the evidence is insufficient to establish a "clear showing" of duress. *Pennsbury Vill. Assocs., LLC*, 11 A.3d at 914.  Pennsylvania courts define duress as "'that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness.'" *Adams v. Adams*, 848 A.2d 991, 993 (Pa. Super. Ct. 2004) (quoting *Strickland v. University of Scranton*, 700 A.2d 979, 986 (Pa. Super. Ct. 1997)); *see also Radon Constr., LLC v. Land Endeavor 0-2, Inc*., 221 A.3d 654, 659 (Pa. Super. Ct. 2019), *appeal denied*, 229 A.3d 913 (Pa. 2020).  Here, the credible evidence before the Court would support a finding that Plaintiff waivered on her decision relative to the settlement terms and may have ultimately signed the agreement while under some degree of stress, anxiety or frustration.  But the preponderance of

credible evidence also establishes that Mr. Koehler explained the terms of the Release Agreement to Plaintiff prior to her signing the document.  Moreover, Plaintiff was supported by at least two other individuals (namely, her roommate and her sister) during the course of this litigation and the ensuing settlement process.  Thus, the Court finds that any pressure Plaintiff may have felt from Mr. Koehler relative to the instant settlement was insufficient to overcome the mind of a person of ordinary firmness.  As a result, no clear showing of duress has been made as would justify setting aside the parties' settlement agreement.

### C.  _Questions Concerning the Impact of the Medicare as Secondary Payer Act_

The next question to be addressed is whether the Release Agreement is unenforceable because of the fact that Plaintiff's physician has not certified the completion of her medical care for any injuries related to the October 15, 2015 incident.  According to Plaintiff, the Release Agreement requires that a letter certifying the completion treatment be incorporated into the contract so that both parties can meet their obligation to properly consider Medicare's interests.

This line of argument implicates certain provisions of the Release Agreement which, in turn, implicate the Medicare Secondary Payer Act ("MSPA"), 42 U.S.C. §1395y(B), as amended.  Given the complexity of these issues, some background discussion of the relevant law and contractual provisions is required.

### 1.  The Medicare as Secondary Payer Act

Beginning in 1980, Congress enacted a series of cost cutting amendments to the Medicare program known collectively as the "Medicare as Secondary Payer" statute or "MSP" provisions (referred to hereafter as the "Medicare as Secondary Payer Act" or "MSPA").  _See Fanning v. United States_, 346 F.3d 386, 388 (3d Cir. 2003) (citing _New York Life Ins. Co. v. United States_, 190 F.3d 1372, 1374 (Fed. Cir. 1999)).  These amendments, codified at 42 U.S.C. § 1395y(b),

were designed to curb health care costs and preserve Medicare's fiscal integrity by requiring

beneficiaries to initially "exhaust all available insurance coverage before looking to Medicare's

coverage." Id. at 388-89 (citations omitted).  The MSPA does this by assigning primary

responsibility to private insurance plans in situations where private coverage for health care costs

is available to a Medicare recipient.  "These private plans are therefore considered 'primary'

under the MSP and Medicare acts as the 'secondary' payer responsible only for paying amounts

not covered by the primary plan." *Id*. at 389 (citing *Blue Cross and Blue Shield of Texas v.

Shalala*, 995 F.2d 70, 73 (5th Cir. 1993)).

As the U.S. Court of Appeals for the Third Circuit has explained, Congress established

"two principal directives" to achieve its objective:

> First, the MSP[A] bars Medicare payments where "payment has already been made
> or can reasonably be expected to be made promptly (as determined in accordance
> with regulations)" by a primary plan. 42 U.S.C. § 1395y(b)(2)(A) (parenthetical in
> original). "Prompt" payment is defined in the applicable regulations as payment
> made within 120 days of either the date on which care was provided or when the
> claim was filed with the insurer, whichever is earlier. See 42 C.F.R. §§ 411.21,
> 411.50. The MSP[A] defines a "primary plan" as "a workmen's compensation law
> or plan, an automobile or liability insurance policy or plan (including a self-insured
> plan) or no fault insurance [.]" 42 U.S.C. §1395y(b)(2)(A)(ii) (parenthetical in
> original). This provision "is intended to keep the government from paying a medical
> bill where it is clear an insurance company will pay instead." *Evanston Hosp. v.
> Hauck*, 1 F.3d 540, 544 (7th Cir.1993) (citation omitted).

> Second, the MSP provides that when Medicare makes a payment that a primary
> plan was responsible for, the payment is merely conditional and Medicare is entitled
> to reimbursement for it. 42 U.S.C. § 1395(y)(b)(2)(B); *Blue Cross and Blue Shield
> of Texas v. Shalala*, 995 F.2d 70, 73 (5th Cir.1993) (2002). Section 1395y(b)(2)(B)
> provides:

>> Any payment under this subchapter with respect to any item or service to
>> which subparagraph (A) applies shall be conditioned on reimbursement to the
>> appropriate Trust Fund established by this subchapter when notice or other
>> information is received that payment for such item or service has been or
>> could be made under such subparagraph.

> 42 U.S.C. § 1395y(b)(2)(B)(i).  Medicare payments are subject to reimbursement
> to the appropriate Medicare Trust Fund once the government receives notice that a

third-party payment has been or could be made with respect to the same item or service.

*Fanning*, 346 F.3d at 389 (footnote and citation omitted).

If the required reimbursement is not made, the government may bring an action against "any entity which is required or responsible ... to make payment ... under a primary plan" and against "any other entity (including a physician or provider) that has received payment from that entity." 42 U.S.C. § 1395y(b)(2)(B)(ii); *see Fanning*, 346 F.2d at 389, n. 4. The government also possesses a separate right of subrogation. *See* 42 U.S.C. § 1395y(b)(2)(iii); *Fanning*, 346 F.2d at 389, n.4.

2.   The Release Language

Because Plaintiff is a Medicare recipient, her recovery in this case implicates the provisions of the MSPA. Recognizing this fact, Walmart incorporated specific provisions into the "Release Agreement" that address the parties' respective obligations under the MSPA. Paragraph 2(a) makes clear that Plaintiff is releasing, among others, any claim against Walmart that might arise or accrue under the MSPA. ECF No. 46, at 2, ¶2(a). Paragraph 2(b) states that the settlement and release will extend to future medical claims, and it acknowledges Plaintiff's responsibility to protect Medicare's interest "as may be required by" the MSPA. Id. at 2, ¶2(b). Paragraph 2(c) acknowledges Plaintiff's status as a Medicare recipient and states that, purposes of the MSPA, "the 'Total Obligation to Claimant' and the amount to be reported to Medicare" by Walmart will be the $250,000 settlement payment. Id. at 2, ¶2(c).

More relevant from Plaintiff's perspective is Paragraph 2(d) of the Release Agreement. Therein, Plaintiff "warrants and agrees" that she has "satisfied Medicare's interest" by:

(i)   securing a letter from [her] treating physician, a true and correct copy of which letter is attached to this Agreement as Exhibit A, certifying in writing to a reasonable degree of medical certainty that treatment for any alleged

18

> injury relating to the Incident and this settlement has been completed as of the Effective Date and that future medical items or services for the injury will not be required. The letter from Plaintiff's treating physician must be acceptable to Walmart and in compliance with and contain certain certifications required in the September 30, 2011 memorandum from CMS,[3] which memorandum is attached to this Agreement as Exhibit B and which memorandum Plaintiff acknowledges she has read.

> (ii)   agreeing that Walmart will make payment to Medicare out of the Settlement Payment, in accordance with Section 3(d) of this Agreement....

ECF No. 46 at 3, ¶2(d).

Other matters pertaining to the MSPA are addressed in Paragraph 3 of the Release Agreement, entitled "Payment Conditioned on MSPA Reporting Compliance; Payment of Health Care or Other Benefits; Payment and Satisfaction of All Liens." ECF No. 46 at 3, ¶3. Sub-paragraph (a) conditions Walmart's payment of settlement proceeds upon Plaintiff's agreement to provide Walmart certain information "for purposes of [its] compliance with 42 U.S.C. §[1395y(b)(8)] . . . ." Id. at ¶3(a). Sub-paragraph (b) contains Plaintiff's certification that the information provided is "true and correct." Id. at 4, ¶3(b). Sub-paragraph (c) sets forth Plaintiff's acknowledgment "that Walmart is obligated to notify Medicare of [the Release

---

[3] The September 30, 2011 CMS Memorandum provides, in relevant part, as follows:

> The purpose of this memorandum is to provide information regarding proposed Liability Medicare Set-Aside Arrangement (LMSA) amounts related to liability insurance . . . settlements, judgments, awards, or other payments ("settlements").

> Where the beneficiary's treating physician certifies in writing that treatment for the alleged injury related to the liability insurance . . . "settlement" has been completed as of the date of the "settlement" and that future medical items and/or services for that injury will not be required, Medicare considers its interest, with respect to future medicals for that particular "settlement" satisfied. If the beneficiary receives additional "settlements" related to the underlying injury or illness, he/she must obtain a separate physician certification for those additional "settlements."

> When the treating physician makes such a certification, there is no need for the beneficiary to submit the certification or a proposed LMSA amount for review. CMS will not provide the settling partner with confirmation that Medicare's interest with respect to future medicals for that "settlement" has been satisfied. Instead, the beneficiary and/or their representative are encouraged to maintain the physician's certification. . . .

ECF No. 51-1 at 12.

Agreement] and the Settlement Payment to be made to Plaintiff" pursuant to federal regulations. Id. at ¶3(c).  In sub-paragraph (d), Plaintiff expressly authorizes Walmart's upfront reimbursement to Medicare of "any and all conditional payments made by Medicare . . . and any conditional payment demand by Medicare . . . relating to the [underlying] Incident or the Suit." Id. at ¶3(d).  Sub-paragraph (e) contains Plaintiff's warranty that she has disclosed all known medical liens that might be asserted relative to treatment she received as a result of the underlying incident.  Id. ¶3(e).  "In order to induce Walmart to enter into [the Release Agreement]," Plaintiff acknowledges, in sub-paragraph (f), her obligation to use the settlement proceeds to satisfy "any and all existing and potential obligations" relative to medical treatment received in connection with the underlying incident.  Id. at 5, ¶3(f).  As further inducement, Plaintiff agrees in sub-paragraph (g) to satisfy "any and all liens, claims or demands . . .  relating to or arising out of any health care treatment and any other benefits received or that may be received by Plaintiff with respect to claims injuries, actual or potential, arising out of or related to the Incident . . . ."  Id. ¶3(g).

The Release Agreement also contains a broad indemnification clause in Paragraph 4, through which Plaintiff agrees to defend and indemnify Walmart from, among other things, "any and all liens, claims, lawsuits, demands, proceedings or actions with respect to health care treatment . . . ."  ECF No. 46 at 5, ¶4.  The breadth of this provision would seemingly extend to any claims potentially arising against Walmart under the MSPA for unresolved health care liens.

### 3.   Analysis of Plaintiff's Assertion That the Release Agreement is Unenforceable

In her counseled brief, Plaintiff maintains that the Release Agreement is unenforceable because a "required component" of the agreement -- that Plaintiff's treating physician certify the completion of her medical treatment -- has not occurred.  ECF No. 52 at 7.  On the contrary, the

record shows that Dr. Kelli Desanctis, one of Plaintiff's treating physicians, authored a letter on March 2, 2020 indicating that Plaintiff was "still being treated" as of that date and "will continue to have further treatments."  ECF No. 51-2.  According to Plaintiff, the Release language mandates that the certification letter be incorporated into the agreement so that both parties can meet their legal and contractual obligation to properly consider Medicare's interests.  *See* ECF No. 52 at 12-13 (citing Release Agreement ¶ 2(d) ("In entering into this Agreement and settling the claims of Plaintiff, the parties have considered Medicare's interest."))  Without such a letter, Plaintiff insists, a "material term" of the Release cannot be satisfied; therefore, the Release as a whole "fails and cannot be enforced."  Id. at 13.

In advancing this argument, Plaintiff invokes the doctrine of "supervening impracticality."  Pennsylvania courts have adopted the articulation of this rule as set forth in Section 261 of the Restatement (Second) of Contracts, *to wit*:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261 (1981); *see Prusky v. Reliastar Life Ins. Co.*, 445 F.3d 695, 700–01 (3d Cir.2006) (quoting *Luber v. Luber*, 614 A.2d 771, 774 (Pa. Super. Ct. 1992) (quoting Restatement (Second) of Contracts § 261)); *In re Land Conservancy of Elkins Park, Inc.*, No. ADV 10-499, 2013 WL 504888, at *3 (E.D. Pa. Feb. 11, 2013) ("Pennsylvania courts have adopted this doctrine of impracticability or impossibility as set forth in the Restatement (Second) on Contracts § 261.").

The Restatement also recognizes, however, that "[a]n obligor's performance may be impracticable only in part."  *See* Restatement (Second) of Contracts § 270 comment a.  And:

> [w]here only part of an obligor's performance is impracticable, his duty to render the remaining part is unaffected if
>
>> (a) it is still practicable for him to render performance that is substantial, taking account of any reasonable substitute performance that he is under a duty to render; or
>>
>> (b) the obligee, within a reasonable time, agrees to render any remaining performance in full and to allow the obligor to retain any performance that has already been rendered.

Id. §270.

 Central to Plaintiff's argument is her assumption that a doctor's letter certifying the termination of her medical treatment is an "essential component" or "material term" of the Release Agreement, in the absence of which substantial performance is impossible.  In this Court's view, that assumption is mistaken.  To be sure, the ongoing nature of Plaintiff's medical care does make it "impracticable" for her to obtain a letter certifying that treatment has been completed and that future medical services will not be required.  But the doctor's certification was merely the means by which Walmart contemplated that Plaintiff would demonstrate that she had "satisfied Medicare's interest" in the settlement proceeds.  ECF No. 51-1 at ¶2(d).  The letter was not, in and of itself, a central term of the parties' bargain.  Rather, the essence of the parties' agreement is Walmart's agreement to pay money in exchange for Plaintiff's agreement to terminate the litigation and release claims.

The central objectives of the Release Agreement can still be achieved -- consistent with the requirements of the MSPA -- even if Plaintiff's medical care is ongoing.  In fact, in Paragraph 2(b), Plaintiff expressly acknowledged that the settlement and release "includes and applies to future medical claims."  ECF No. 51-1 at 2, ¶2(b).  Therein, Plaintiff "further acknowledges her responsibility to protect Medicare's interest as may be required by 42 U.S.C. §1395y(b)."  Id.  To that end, under Paragraph 3(f), Plaintiff agreed that "the Settlement Payment

22

. . . is intended to satisfy any and all existing *and potential obligations* to pay for, or to reimburse

the payer (including . . . Medicare . . .) of any health care treatment and any other benefits

received *or that may be received* by Plaintiff with respect to claimed *injuries, actual or potential*,

arising out of or related to the [October 15, 2015] Incident."  ECF No. 51-1 at 5, ¶3(f) (emphasis

added).  "In order to induce Walmart to enter into [the Release Agreement] and make . . . the

Settlement Payment . . . ," Plaintiff expressly agreed to use the settlement proceeds to satisfy

"any and all liens, claims or demands . . . relating to or arising out of any health care treatment

and any other benefits . . . *that may be received by Plaintiff* with respect to claimed injuries,

actual *or potential*, arising out of or related to the Incident.  Id. ¶3(g) (emphasis added).  Plaintiff

further promised to provide Walmart with proof of her payments and discharge of any and all

liens relating to or arising out of the Incident."  *Id*.  Finally, as noted, Plaintiff agreed to defend

and indemnify Walmart in the event that Medicare sued Walmart for reimbursement of any

additional unpaid health care liens. ECF No. 51-1 ¶4.   In short, the plain language of the Release

Agreement contemplates that future medical liens or claims might arise, that Plaintiff is obligated

to use the settlement proceeds to satisfy those obligations to the extent required by the MSPA,

that Walmart can require proof of such compliance, and that, if Medicare later sues Walmart

based upon Plaintiff's failure to abide by her obligations under the MSPA, Plaintiff would have

to defend and indemnify Walmart.  The Release Agreement thus allows for Medicare's interests

to be taken into account with respect to future health care costs, albeit by shifting the burden onto

Plaintiff satisfy future Medicare liens or claims from the settlement proceeds.

     Nothing in the September 30, 2011 CMS Memorandum, appended to the Release

Agreement as Exhibit B, precludes such an arrangement.  The express purpose of the CMS

Memorandum is to "provide information regarding *proposed* Liability Medicare Set-Aside

Arrangement (LMSA) amounts related to liability insurance . . . settlements, judgments, awards, or other payments . . . ." ECF No. 51-1 at 12 (emphasis supplied).  The memorandum does not *require* that a settling Medicare beneficiary acquire a letter certifying the completion of his or her treatment.  Instead, it merely advises that, "[w]hen the treating physician makes such a certification, there is no need for the beneficiary to submit the certification or a proposed LMSA amount for review."  Id.

Nor does the September 30, 2011 CMS memorandum mandate that the settling parties create a LMSA where treatment is ongoing.  Instead, the memorandum alludes to the fact that such set-aside arrangements are a *proposal.*  As one district court has explained, LMSAs are not mandated by the MSPA in personal injury cases that involve liability insurance settlements outside of the worker's compensation context:

> Defendants cite to a memorandum, dated September 29, 2011, from the Centers for Medicare & Medicaid Services ("CMMS") stating that, under the MSP, "[a]ll parties do have significant responsibilities under the MSP to protect Medicare's interests when resolving cases that includes [sic] future medical expenses. A *recommended method* to protect Medicare's interest is a set-aside arrangement, which allocates a portion of the settlement for future medical expenses.  The amount of the set-aside is determined on a case-by-case basis." (Def.'s Cert., Ex. C) (emphasis in original). However, it is well-settled that "[i]nterpretations such as those in opinion letters-like interpretations contained in policy statements, agency manuals, and enforcement guidelines ... lack the force of law...." *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L.Ed.2d 621 (2000); *see also Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99, 115 S. Ct. 1232, 131 L.Ed.2d 106 (1995) (definition in Medicare Provider Reimbursement Manual "is a prototypical example of an interpretive rule" that does not require notice and comment, and therefore "do[es] not have the force and effect of law and [is] not accorded that weight in the adjudicatory process[.]").

> Indeed, no federal law requires set-aside arrangements in personal injury settlements for future medical expenses. To be sure, Medicare set-asides are prudent in settlements for future medical expenditures in the worker's compensation context because, under the MSP, Medicare becomes a secondary payer for such expenditures to the extent a "compensation award stipulates that the amount paid is intended to compensate the individual for all future medical expenses," 42 CFR §

411.46(a), or "the settlement agreement allocates certain amounts for specific future medical services," 42 CFR § 411.46(d)(2).

> The settlement in this case, however, does not arise in the worker's compensation context. And it does not indicate a particular amount to compensate Mr. Sipler for future medical expenses arising out of the accident. Nor should it. In contrast to the worker's compensation scheme that "generally determine[s] recovery on the basis of a rigid formula, often with a statutory maximum .... [t]ort cases ... involve noneconomic damages not available in workers' compensation cases, and a victim's damages are not determined by an established formula." *Zinman v. Shalala*, 67 F.3d 841, 846 (9th Cir.1995) (citation omitted). Thus, to require personal injury settlements to specifically apportion future medical expenses would prove burdensome to the settlement process and, in turn, discourage personal injury settlements.[ ] *See McDermott, Inc.  v. AmClyde*, 511 U.S. 202, 215, 114 S. Ct. 1461, 128 L.Ed.2d 148 (1994) (noting that "public policy wisely encourages settlements"). In sum, the parties in this case need not include language in the settlement documents noting Mr. Sipler's obligations to Medicare or fashion a Medicare set-aside for future medical expenses.

*Sipler v. Trans Am Trucking, Inc.*, 881 F. Supp. 2d 635, 638–39 (D.N.J. 2012) (quoting and discussing CMS Memorandum dated September 29, 2011) (internal footnote omitted).

What this means in the context of the present case is that Plaintiff is still in a position to render "substantial performance" under the Release Agreement, notwithstanding her inability to provide the certification that was contemplated in Paragraph 2(d)(i).  *See* Restatement, supra, §270.  In addition, Walmart has, "within a reasonable time," agreed to render any remaining performance in full, as it has indicated a willingness to waive the requirement of the certification letter, pay the agreed upon settlement amount, and take steps to satisfy Plaintiff's Medicare lien, consistent with its contractual obligations.  Consequently, Plaintiff's inability to certify the completion of her medical care does not excuse her remaining obligations under the Release Agreement, most especially her agreement to release existing and potential claims arising from the October 15, 2015 incident.

Finally, even if the Court concludes that the provisions in Paragraph 2(d) have been rendered invalid or in some manner unenforceable, the Release Agreement provides a remedy of

severability.  Pursuant to Paragraph 16 of the agreement, "Plaintiff understands and agrees that, if any provision of this agreement is declared to be invalid or unenforceable by a court of competent jurisdiction, such provision or portion of this agreement will be deemed to be severed and deleted from this Agreement, but this Agreement in all other respects will remain unmodified and continue in full force and effect. . . ."  ECF No. 51-1 at 9, ¶16.

## IV.   Conclusion

Based upon the foregoing reasons, the Court finds by a preponderance of the credible evidence that Plaintiff expressly authorized the settlement that is embodied in the Release Agreement.  The Court further finds that the agreement was not rendered void or voidable on the basis of fraud, mistake, or duress.  The Court also concludes, as a matter of law, that Plaintiff's inability to obtain a letter of certification from her treating physician, as referenced in Paragraph 2(d)(i) of the Release Agreement, did not render the agreement, as a whole, unenforceable. Accordingly, with the exception of Paragraph 2(d)(i), the Court will grant Defendant's motion to enforce the Release Agreement.

An appropriate order follows.


SUSAN PARADISE BAXTER
United States District Judge